IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NUMBERAI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| FLAI TECHNOLOGIES INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff NumberAI, Inc. d/b/a Numa ("Numa" or "Plaintiff") brings this action for patent infringement against Flai Technologies Inc. ("Flai" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1. This action concerns Flai's infringement of U.S. Patent No. 10,917,483 (the "'483 Patent") and U.S. Patent No. 11,553,055 (the "'055 Patent") (collectively, the "Asserted Patents" or "Patents-in-Suit").

2. Numa is the assignee and owner of all rights, title, and interest in the '483 Patent and the '055 Patent.

3. This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. §271.

## THE PARTIES

4. Numa is a corporation organized and existing under the laws of Delaware, having a principal place of business located at 492 9th Street #300, Oakland, California 94607.

5. On information and belief, Flai is a corporation organized and existing under the laws of Delaware, having a principal place of business located at 1188 Guerrero Street, San Francisco, CA 94110.

6.     On information and belief, Flai may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## JURISDICTION AND VENUE

7.     This civil action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., including in particular, under 35 U.S.C. § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a).

8.     This Court has personal jurisdiction over Flai, and venue is proper in this district pursuant to 28 U.S.C. § 1400(b), at least because Flai is a Delaware corporation and thus resides in this district.

## THE PATENTS-IN-SUIT

9.     The '483 Patent, entitled "Automated Communication-based Intelligence Engine," was duly and legally issued on February 9, 2021, by the U.S. Patent and Trademark Office ("USPTO").  A true and correct copy of the '483 Patent is attached as **Exhibit 1**.

10.    The '055 Patent, entitled "Automated Communication-based Intelligence Engine," was duly and legally issued on January 10, 2023, by the USPTO.  A true and correct copy of the '055 Patent is attached as **Exhibit 2**.

11.    The '055 Patent is a divisional of the '483 Patent.  Both the '483 Patent and '055 Patent ("Asserted Patents") share the same specification and figures. By virtue of their issuance, the Asserted Patents are presumed valid.

12.    Both the '483 Patent and the '055 Patent generally relate to distributed computerized communication-processing systems configured to generate, maintain, and update entity-specific communication state representations using structured communication-event data in networked messaging environments. The Asserted Patents are not directed merely to collecting

communications, analyzing them with generic artificial intelligence, and reporting a result. Rather, the Asserted Patents claim specific ordered combinations of networked communication-processing operations in which communication-derived machine-readable state is generated and maintained to govern subsequent operations in active communication sessions, thereby causing interconnected computing systems to perform particular communication-processing functions in a specified sequence. Specifically, the disclosed systems employ AI models that are integrated into and operate within a distributed communication-processing architecture as components of the communication-processing workflow, in which automated software agents asynchronously process communication-event streams, update machine-readable communication-based information, synchronize that communication-based information across multiple communication sessions, and invoke subsequent communication-processing operations based on the synchronized communication-based information. *See, e.g.*, '483 Patent, claim 1, 3:48-52, 8:56-67. The iterative updating and improvement of those AI models, including the entity model, is not the only technological improvement claimed, however. By iteratively updating and improving the AI models, such as the entity model, claims of the '483 Patent and the '055 Patent also achieve improvements in underlying computer and communication technologies, enabling persistent machine-maintained communication context in high-volume networked environments without the need for human oversight. Namely, these improvements include more efficient communication processing, reduced response latency, reduced redundant network activity, and conservation and more effective allocation of system-processing and network-bandwidth resources, while enabling persistent machine-maintained communication context without continuous human oversight. As stated in the specifications, "system processing and network bandwidth resources are conserved," and the claimed "system makes category gathering and clustering more efficient by directing

3

where efforts will be most impactful thereby conserving processing resources and network bandwidth." *See, e.g.*, *id.* at 10:45-46; 10:54-57. And finally, the Asserted Patents further describe a separate but complementary technological improvement in the accuracy and reliability of the machine-generated outputs and machine-maintained entity data through validation, correction, updating of the entity model and datastore, and application of that updated and corrected data to connected computerized systems. *See, e.g.*, *id.* at 13:51-14:9; 14:22-67, 15:30-16:14. Thus, both the '483 Patent and the '055 Patent recite patent-eligible subject matter.

13.     For the '483 Patent, a communication-session routing architecture is claimed in which historical communications and conversion outcomes are used to generate a likelihood-of-conversion model; communications in an active electronic communication session are analyzed using that model; and the resulting likelihood is used to control handoff of the active session from an artificial response system to a user. By applying the likelihood-of-conversion model during an active electronic communication session, the claimed system can determine whether continued automated processing or transfer to a human communication-processing resource is warranted without indiscriminately routing every session for human review. This is not merely faster human judgment implemented on a computer. Rather, the '483 Patent claims a specific computer-controlled session-transfer mechanism in which communication-derived session state is generated and used to govern automated transfer decisions during active communication sessions. The claimed model and system are built and trained using actual conversations, tagged as successful or unsuccessful, thereby grounding the model in observed conversion outcomes. *See, e.g.*, *id.* at 15:56-16:24; 16:54-67; claim 1. The determined likelihood is not merely displayed or reported, but is applied as a control value that governs whether the active communication session continues to be processed by the artificial response system or is handed off to a human user. *See, e.g.*, *id.* at

4

16:15-42; 17:10-40. The claimed mechanism replaces conventional static routing rules, voicemail queues, and manual review with a state-driven routing process that causes the communication system to perform different routing operations based on dynamically maintained session state. This improves computerized communication session management by using communication-derived state to allocate processing resources during active sessions, reducing unnecessary transfers, duplicative processing, and associated use of system-processing and network-bandwidth resources.

14.    For the '055 Patent, an entity-data synchronization architecture is claimed where monitored communications are used to build an entity model containing entity data; a later online chat message is processed using that entity model to generate an update to the entity data; and the update is applied over a network through an application programming interface to change electronically published entity information. Because the entity model is built and improved from monitored communications and the resulting update is applied through an application programming interface, the claimed system can propagate current entity information to a connected platform without repeatedly processing the full body of previously received communications or requiring a separate manual update process. This is not merely analyzing a message and displaying a result. It is a specific model-update and API-update process for keeping network-connected platform data synchronized with information derived from communications. This improves networked communication platforms by reducing redundant processing and unnecessary network activity while maintaining current electronically published information, thus conserving processing resources and network bandwidth.

15.    The '055 Patent also improves the accuracy, timeliness, and reliability of information maintained and supplied by network-connected computer systems. This is not merely

the human activity of reading a communication, determining that published business information is incorrect or outdated, and requesting that the information be changed. Rather, claim 1 recites a specific ordered combination in which multiple communications are monitored to build an entity model comprising entity data; a particular online chat message is monitored and applied to the entity model to generate an update to the entity data; and the resulting update is applied over a network through an application programming interface enabled by the particular platform to change an electronically published FAQ, hours-of-operation listing, or event listing. *See* '055 Patent, claim 1; 11:41-12:26. The resulting entity-data update is not merely displayed or reported for human consideration but instead changes the machine-maintained state of a separate network-connected platform. By propagating communication-derived updates from the entity model to the corresponding electronically published information, the claimed process reduces conflicts and divergence between the entity data maintained by the system and the information supplied by the connected platform. The system applies automatic corrections and additions to the entity model, publishes updated facts to connected services, detects conflicting or out-of-date facts, and programmatically registers changes to incorrect listings. *See, e.g.*, *id.* at 10:62-11:2, 11:18-42, 12:1-26. The claimed process thereby improves the accuracy, timeliness, and reliability of the platform's electronic outputs, while reducing redundant processing and unnecessary network activity and conserving processing resources and network bandwidth.

16.     Both the '483 and '055 Patents achieve improvements in the underlying computer functionalities by using iteratively updated communication-derived models and entity-state information to control subsequent system operations, including how system processing and network resources are allocated.  Specifically, the patents describe building entity models to analyze and process new communication-based information, and use such analysis "to improve

6

the entity model, to keep the bot up-to-date, and to update other services and products that the entity relies on." '483 Patent, Abstract, 3:48-52; '055 Patent, Abstract, 3:52-56. Those operations are integrated into specific networked communication-processing architectures that use updated machine-readable state to control active-session handoff, response generation, routing, synchronization, and API-based platform updates without repeatedly reconstructing communication context or indiscriminately applying processing and network resources to every communication and entity. The patents further explain that these architectures conserve processing resources and network bandwidth by directing processing and network resources toward communications and entity updates where those resources will be most impactful. *See, e.g.*, '483 Patent, 10:54-57 ("The system makes category gathering and clustering more efficient by directing where efforts will be most impactful thereby conserving processing resources and network bandwidth."); '055 Patent, 10:58-61 (same); '483 Patent, 16:41-44 ("In this manner system processing resources and network bandwidth is conserved and allocated in greatest part toward communications with higher possibilities of conversion."); '055 Patent, 16:44-47 (same). The Federal Circuit has long held that claimed subject matters that improve the functioning of a computer or other technology or technological field are not directed to a judicial exception and are patentable. *See, e.g., Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1339 (Fed. Cir. 2016) (claims to a self-referential table for a computer database were directed to an improvement in computer capabilities and not directed to an abstract idea); *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1315 (Fed. Cir. 2016) (claims to automatic lip synchronization and facial expression animation were directed to an improvement in computer-related technology and not directed to an abstract idea).

17. The claimed inventions differ from those that merely apply a generic machine-

learning model to a new category of data. The Asserted Patents do not claim machine learning as an end in itself, nor do they rely on the mere fact that a model is trained on a particular dataset. Instead, the claims recite how communication-derived model data is integrated into a networked communication-processing architecture to control subsequent system operations, including active-session handoff from an artificial response system to a user and API-based synchronization of entity-data updates with connected platforms. The model-derived information is not merely displayed or reported for human consideration but is applied within the claimed architecture to cause required changes in communication-session processing and machine-maintained platform state. The asserted claims therefore recite specific improvements to computerized communication-session management and platform synchronization, e.g., conserving processing resources and network bandwidth, not just the abstract idea of collecting information, analyzing it, and displaying or transmitting the result.

18. Moreover, the claimed inventions, at a minimum, recite integrations and operations of components that were not well-understood, routine, or conventional. The Asserted Patents explain that prior systems relied on human judgment to create and maintain entity information, lacked mechanisms to update or identify gaps in entity information, and used personnel or primitive funnel analytics to evaluate customer journeys. *See, e.g.*, '483 Patent, 2:5-67. Against that background, the '483 Patent recites an ordered combination in which communications and conversion outcomes are used to, for example, generate likelihood information that controls handoff of an active communication session from an artificial response system to a human user. *See, e.g.*, *id.* at 16:15-44; 17:10-40; claim 1. The '055 Patent recites an ordered combination in which monitored communications are used to build and apply an entity model, generate an entity-data update from an online chat message, and apply the update through a platform-enabled

8

application programming interface to change specified electronically published information. *See, e.g.*, '055 Patent, 11:43:12-26; claim 1.

## FACTUAL BACKGROUND ON NUMA

19.     Numa is an innovator in AI-powered communications, customer operations, and automated communication-based intelligence technology. Numa develops and provides software solutions for businesses, including automotive dealerships, to manage customer communications across communication channels, including calls, texts, voicemails, chats, reviews, and related customer interactions.

20.     Numa was founded by Tasso Roumeliotis (Chief Executive Officer), Andrew Ruff (Chief Product Officer), and Joel Grossman (President), a team with substantial experience building communications, mobile, and enterprise software technologies. Building on that background, Numa developed technology directed to one of the most persistent operational problems facing businesses and automotive dealerships: how to receive, understand, route, respond to, and act on high volumes of customer communications across fragmented communication channels.

21.     The Asserted Patents reflect the substantial investment and foundational technological work of Numa's co-founders, each of whom is identified as a named inventor on the Asserted Patents.

22.     At the time of the inventions, conventional business communication systems did not provide the claimed ordered combinations of monitored multi-session communication processing, communication-derived model or entity-data generation, artificial-response-system control, active session handoff based on model output, and API-based synchronization of communication-derived entity-data updates with network-connected platforms. Conventional

systems typically stored or displayed communications, applied static routing rules, or required manual review and manual updates. The claimed inventions improved computerized communication-processing systems by enabling the systems themselves to maintain machine-usable communication and entity state, apply that state during active electronic communications, and trigger computer-controlled routing, handoff, response, synchronization, and platform-update operations.

23.     Businesses that receive high volumes of customer communications often face technological and operational challenges in identifying the purpose, urgency, status, context, and business significance of incoming communications across different communication channels and networked systems. Conventional communication systems often treated calls, texts, voicemails, chats, electronic posts, and other communications as separate message objects requiring manual review, manual routing, and separate tracking, which increased the likelihood of missed communications, delayed responses, inconsistent follow-up, lost sales opportunities, and incomplete visibility into customer issues.

24.     These problems were not solved merely by allowing businesses to receive calls, texts, voicemails, chats, or other communications through electronic devices or generic messaging platforms. Businesses still needed improved computerized systems capable of processing and analyzing communications in context, maintaining machine-readable information about customers and entities, associating communications with relevant customer or business information, identifying appropriate system actions, and triggering, routing, escalation, response, follow-up, or platform-update operations across distributed communication channels and networked systems.

25.     Numa developed communication-based intelligence technology to address these problems in the operation of business communication systems. Numa's technology uses

specifically configured software systems to receive and process communication-based information; maintain and update customer, business, and entity-specific information; generate context-sensitive response and workflow outputs; and provide improved visibility into the status, content, and operational significance of the customer communications across communication channels.

26.     Numa's technology allows computerized communication systems to do more than merely transmit, store, or display messages.  By building and improving entity-specific machine learning models, it enables automated and semi-automated processing of real time monitoring of communications, including analyzing communication content and metadata, associating communications with relevant entity-model information, determining conversion likelihoods or other communication characteristics, routing communications between automated agents and human users, generating suggested or automated responses, updating business information, and propagating updates to network-connected platforms all in real time.  By doing so, Numa's technology not only improves automated communication processing efficiency, reduces response latency, and enables persistent machine-maintained communication context in high-volume networked environments, among other benefits, it also enables improvements to the functionality of the underlying computer or network platform itself.  As non-limiting examples, Numa's technology conserves "processing resources and network bandwidth" by "re-crawling for a specific entity" to conserve "bandwidth resources" and "makes category gathering and clustering more efficient by directing where efforts will be most impactful thereby conserving processing resources and network bandwidth." *See, e.g.*, '483 Patent, at 10:43-57.  Numa's technology also creates and utilizes a clustering model to improve efficiencies of distribution of communication data aggregated from one or more secondary entities into one or more entity cluster assignments

11

based on machine learning based on analytical analysis of the aggregated communication data. *See, e.g.*, '483 Patent at 8:50-52, FIGs. 3-4.

27.    Numa's technology also improves how customer communications are handled across distributed business teams and network-connected platforms. By combining communication monitoring, structured communication-event processing, entity-specific information, machine-learning-based analysis, automated agents, user interfaces, and workflow-control operations, Numa's technology enables communication systems to identify relevant information from customer communications and use it to drive subsequent routing, responses, follow-ups, handoffs, synchronization, and platform updates.

28.    Numa develops computerized communication-session management and workflow-orchestration technology for automotive dealerships. Numa's systems include AI-powered communication agents and centralized communication-processing interfaces configured to process calls, texts, chats, and related communication sessions; manage asynchronous customer communication sessions; coordinate communication routing and handoff operations; generate context-sensitive communication outputs; and maintain updated communication and customer information across dealership communication channels and operational systems.

29.    Numa's innovations extend across dealership voice, text, chat, service, sales, scheduling, and customer-communication workflows. Among other things, Numa's technology analyzes customer communications, uses context from customer history and dealership systems, routes tasks and follow-ups across dealership teams, identifies sentiment and other characteristics, and brings human dealership personnel into communications when needed.

30.    Numa has invested substantial time, effort, and resources in developing proprietary technologies for automated communication-based intelligence, including technologies for

12

analyzing communication-based data, maintaining and improving entity-specific models and information, generating and improving automated responses, determining communication characteristics and conversion likelihoods, updating connected systems, and enabling automated agents to assist with customer interactions. This investment in Numa's technological innovations led to Numa being awarded the Asserted Patents by the USPTO.

31.    The Asserted Patents protect Numa's innovations in computerized communication-session management and distributed communication-processing systems. The patented technologies address, among other things, specific systems and methods for processing communication-based data within networked communication environments using machine-learning systems, entity models, model datastores, communication datastores, sentiment analysis, monitoring agents, APIs, automated bots, and artificial response systems to coordinate communication analysis, response generation, context-sensitive model updating, and communication-session handling. Through the coordinated operation of those components, the patented systems avoiding unnecessary processing of communications and duplicative transmission of information among network-connected components.

32.    The Asserted Patents claim specific combinations of computerized communication-processing components and coordinated communication-session management operations configured to improve how communication-based information is processed, routed, updated, and synchronized within networked communication environments to further improve how processing and network resources are allocated within networked communication environments. Those combinations include, for example, iteratively training, updating, and applying likelihood-of-conversion models so that active communication sessions can be selectively routed or handed off between artificial response systems and human users without subjecting every session to the same

processing and transfer operations. They also include generating, maintaining, and updating/improving entity models derived from monitored communication data and applying results updates to network-connected platforms, including through application programming interfaces.

33. The claimed technologies of the Asserted Patents do not merely use computers as passive tools for collecting, storing, or displaying information. Instead, as discussed above, they recite particular computerized mechanisms for transforming monitored communications into a machine-usable model and entity data, and using that model and data to selectively control subsequent communication-processing operations, including automated responses, routing, handoffs, follow-ups, platform updates, and synchronization across network-connected systems, thereby reducing redundant computation and network activity.

34. The claimed technologies of the Asserted Patents further improve the communication systems themselves by using feedback from communications, user selections, response outcomes, wait times, success indications, and other communication-session information and data to update the models and entity information that govern system behavior. These updates are used by the systems to alter future response generation, routing, handoff, recommendation, synchronization, and platform-update operations, thereby improving the operation of the computerized communication-processing systems themselves, including by reducing redundant processing, directing resources toward communications where they will be most impactful, conserving network bandwidth, and reducing response latency. Moreover, as discussed above, these updates allow for generating, training, and improving the models run by the communication systems and, thus, the underlying technology itself. The updates alter the machine-readable state used by the system to govern later computerized operations and thereby change subsequent

response generation, routing, handoff, synchronization, platform-update operations, and electronic outputs.

35. The Asserted Patents address problems rooted in modern networked communication environments, including the inability of conventional systems to maintain accurate, current, and coherent communication-based information across asynchronous communications, human users, datastores, APIs, messaging platforms, telecommunication interfaces, online services, and business workflow systems. The patented technologies provide specific software-based solutions to those problems by coordinating communication monitoring, model-based analysis, automated intelligence agent operations, user-interface feedback, synchronized updates across networked communication systems, and improving the underlying models and technology itself.

36. Numa practices and commercializes technology embodying the innovations claimed in the Asserted Patents through its AI communications platform and related products and services.

### FACTUAL BACKGROUND ON FLAI

37. Flai develops, markets, offers for sale, sells, and/or provides an AI-powered customer communications and customer experience platform for automotive dealerships under the name "Flai," at https://useflai.com/ (the "Accused Flai Product").

38. Flai is designed to handle dealership customer work that arrives through multiple channels, including calls, texts, forms, after-hours questions, service lists, sales opportunities, and follow-up paths. Flai receives and processes customer communications across dealership sales, service, and parts workflows, including voice, text, messages, online inquiries, and related customer interactions. *See* https://www.useflai.com.

39.    Flai includes AI receptionist and sales-focused AI functionality. *See* https://www.useflai.com. The AI receptionist answers common questions, asks follow-up questions, routes callers to the correct department based on intent, books appointments, captures lead details, and supports sales, service, and parts workflows. *See* https://www.useflai.com/blog/virtual-receptionist-for-car-dealerships. Flai's sales functionality attempts to turn calls, messages, and online inquiries into sales opportunities by capturing leads, answering questions, collecting lead details, responding based on buyer intent, and logging interactions for dealership teams. *See* https://www.useflai.com/blog/how-ai-follow-up-is-helping-dealerships-close-more-sales-leads.

40.    Flai also includes service scheduling and appointment-booking functionality. Flai answers inbound calls, detects customer intent, captures details such as name, vehicle, and reason for calling, checks the dealership's live shop schedule, presents available appointment slots, confirms appointments, and supports ongoing customer conversations. *See* https://www.useflai.com/blog/how-to-automate-service-appointment-scheduling-at-your-dealership.

41.    Flai integrates with dealership systems and platforms used to manage customer communications and dealership operations. Flai's website identifies integrations with systems such as Xtime, MyKaarma, Tekion, Dealer-FX, vAuto, elead, VinSolutions, Reynolds & Reynolds and others, and describes end-to-end booking by phone and text directly into dealership systems. *See* https://www.useflai.com/. For example, Flai also books customers into the Tekion Automotive Retail Cloud through real-time Tekion integration. *See* https://www.useflai.com/blog/tekion-integration.

42.    Flai monitors dealership communications and workflows. Its AI-powered platform

helps dealerships manage customer interactions, track calls, messages, and requests, receive alerts for unresolved calls and requests, and track open requests and pending follow-ups. *See* https://www.useflai.com/blog/ai-for-car-dealerships-guide.

43.     Flai is tailored to the particular dealership and dealership workflows where it is deployed. The Flai website states that the Flai uses "AI to answer customers any time, across any channel the way your best dealership employee would" and integrates "with your existing dealership technology stack, including your scheduler, DMS, and CRM." https://www.useflai.com.

44.     On information and belief, the Accused Flai Product builds, maintains, and applies dealership-specific information and models based on dealership communications, workflows, customer interactions, scheduling data, customer and lead information, call recordings, transcripts, routing information, appointment information, attribution data, and related dealership operational data. *See* https://www.useflai.com.

45.     On information and belief, the Accused Flai Product uses dealership-specific information and AI models to process customer communications from sales leads, service customers, prospective buyers, and other dealership customers, and to generate responses, routing decisions, appointment bookings, follow-up actions, alerts, transcripts, CRM/DMS updates, and other updates to dealership data. *See* https://www.useflai.com/blog/how-ai-follow-up-is-helping-dealerships-close-more-sales-leads.

46.     On information and belief, Flai makes, uses, offers to sell, and/or sells within the United States, and imports into the United States, the Accused Flai Product.

### **COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,917,483**

47.     Numa incorporates and realleges paragraphs 1-46 above as if fully set forth herein.

48.     Numa owns the entire right, title, and interest in and to the '483 Patent, including the sole and exclusive right to sue for infringement of the '483 Patent.

49.     The '483 Patent is valid and enforceable.

50.     Flai has infringed and continues to infringe one or more claims of the '483 Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority the Accused Flai Product. **Exhibit 3** provides an exemplary infringement claim chart demonstrating how the Accused Flai Product infringes at least claim 1 of the '483 Patent.

51.     For example, Flai's Accused Flai Product directly infringes at least claim 1 of the '483 Patent (*see generally* Ex. 3), at least by:

a)      receiving multiple communications from multiple dealership customers, prospective buyers, sales leads, and service customers during multiple electronic communication sessions, including communications that result in conversions and sales-related transactions such as lead captures, qualified buying interest, test-drive bookings, showroom visits, appointments, and vehicle purchases (*see id.* at limitation 1.1a-1.1c);

b)      training and/or updating a likelihood-of-conversion model based on the received communications and conversion-related outcomes, including lead qualification, appointment bookings, test-drive bookings, sales opportunities, and other conversion data (*see id.* at limitation 1.2);

c)      receiving, via a network, particular communications from particular dealership customers, prospective buyers, or leads during particular communication sessions (*see id.* at limitation 1.3);

18

d)      using Flai's artificial response system, including its AI receptionist and sales AI functionality, to respond to those particular communications by answering questions, asking follow-up questions, collecting lead or customer details, providing information, and routing communications based on intent (*see id.* at limitation 1.4);

e)      analyzing the particular communications to determine a particular likelihood of conversion based on the likelihood-of-conversion model, including a likelihood that the particular customer, buyer, or lead will engage in a sales-related transaction (see id. at limitation 1.5); and

f)      handing off the particular communication session from Flai's artificial response system to a dealership user, employee, department, sales representative, service advisor, BDC agent, or other human user based on the determined likelihood of conversion, buyer intent, qualification, urgency, complexity, or need for human support (*see id.* at limitation 1.6).

52.     Numa has been damaged by Flai's infringement of the '483 Patent and will continue to be damaged by such infringement. Numa is entitled to recover from Flai the damages sustained by Numa as a result of Flai's wrongful acts.

53.     Numa has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Flai is permanently enjoined by this Court.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,553,055**

54.     Numa incorporates and realleges paragraphs 1-51 above as if fully set forth herein.

55.     Numa owns the entire right, title, and interest in and to the '055 Patent, including the sole and exclusive right to sue for infringement of the '055 Patent.

56.     The '055 Patent is valid and enforceable.

57.    Flai has infringed and continues to infringe one or more claims of the '055 Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority the Accused Product. **Exhibit 4** provides an exemplary infringement claim chart demonstrating how the Accused Flai Product infringes at least Claim 1 of the '055 Patent.

58.    For example, Flai's Accused Flai Product directly infringes at least claim 1 of the '055 Patent (*see generally* Ex. 4), at least by:

a)    monitoring multiple communications of a particular dealership or dealership entity, including calls, texts, messages, online inquiries, forms, chats, service communications, sales communications, and follow-up interactions (*see id.* at limitation 1.1);

b)    building an entity model of the particular dealership or dealership entity based on those monitored communications, the entity model comprising dealership-specific entity data such as workflows, departments, customer and lead information, scheduling information, call logs, transcripts, recordings, routing information, appointment information, attribution information, and related operational data (*see id.* at limitations 1.2a-1.2b);

c)    monitoring at least one particular communication of the particular dealership or dealership entity, including a particular customer communication, sales inquiry, service request, appointment request, online inquiry, text, chat, or follow-up communication (*see id.* at limitation 1.3);

d)    applying the entity model to the particular communication to generate an update to the entity data of the entity model, including updated lead details, customer needs, appointment information, routing outcomes, transcripts, attribution, confirmations, follow-up status, CRM/DMS records, and related customer-communication data (*see id.* at limitation 1.4);

20

e)      applying the update to a particular platform via a network, including by applying customer, lead, appointment, scheduling, routing, transcript, attribution, confirmation, and communication-related updates to dealership systems such as, DMS, CRM, Tekion, Dealer-FX, and/or related dealership platforms (*see id.* at limitation 1.5);

f)      monitoring and processing at least one particular communication comprising an online chat message or analogous online message between the dealership or dealership entity and a particular customer, prospective buyer, service customer, or other user (*see id.* at limitation 1.6);

g)      applying the entity model to the online chat message or analogous online message to generate an update to the entity data of the entity model (*see id.* at limitation 1.7); and

h)      applying the update to the particular platform by changing at least one of electronically published FAQs, an hours-of-operation listing, or an event listing, such as a service appointment in a scheduler, via an application-program-interface-enabled platform, including through Flai's networked integrations with dealership systems and platforms (*see id.* at limitation 1.8).

59.     Numa has been damaged by Flai's infringement of the '055 Patent and will continue to be damaged by such infringement. Numa is entitled to recover from Flai the damages sustained by Numa as a result of Flai's wrongful acts.

60.     Numa has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Flai is permanently enjoined by this Court.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

a)      Judgment in Numa's favor against Defendant on all causes of action alleged herein;

b)      A finding that the Patents-in-Suit have been and continue to be infringed by Flai under 35 U.S.C. § 271(a);

c)      An award of damages to Numa for Flai's infringement of the Patents-in-Suit, in an amount to be determined at trial, but in no event less than a reasonable royalty pursuant to 35 U.S.C. § 284;

d)      An award of Plaintiff's reasonable costs and expenses in this action;

e)      A permanent injunction against further infringement of the Patents-in-Suit by Flai and its parents, subsidiaries, affiliates, officers, directors, agents, servants, employees, successors and assigns, and all others in active concert or participation with any of the foregoing; and

f)      Such further and other relief as this Court deems proper and just.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Jennifer Ying*

Karineh Khachatourian
Trevor Giampaoli
Amanda Ogata
Haley Sinfield
KXT LAW, LLP
1775 Woodside Road, Suite 204
Redwood City, California 94061
650-239-0420

Karen Jacobs (#2881)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
jying@morrisnichols.com

July 22, 2026

*Attorneys for Plaintiff*